UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DIANNA R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00344-DLP-JRS |
| | ) | |
| ANDREW M. SAUL, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON COMPLAINT FOR JUDICIAL REVIEW

Plaintiff Dianna R.[1] seeks judicial review of the denial by the Commissioner

of the Social Security Administration ("Commissioner") of her application for Social

Security Disability Insurance Benefits ("DIB") under Title II of the Social Security

Act ("the Act"). *See* 42 U.S.C. §§ 423(d), 405(g). For the reasons set forth below, this

Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and

**REMANDS** this matter for further consideration.

## I.   PROCEDURAL HISTORY

On August 7, 2014, Dianna filed a Title II application for a period of

disability and disability insurance benefits, alleging that her disability began on

June 3, 2010. Dianna asserts that her disability is caused by comorbid impairments

including coronary artery disease with congestive heart failure, lumbar

---

[1] The Southern District of Indiana has adopted the recommendations put forth by the Court
Administration and Case Management Committee regarding the practice of using only the first
name and last initial of any non-government parties in Social Security opinions. The Undersigned
has elected to implement that practice in this Order.

degenerative disk disease[2] with significant back, hip, and radicular leg pain, and depression. Dianna's claim was denied initially and upon reconsideration. Dianna then filed a written request for a hearing, which was granted.

Administrative Law Judge ("ALJ") Roy E. LaRoche, Jr. conducted a video hearing on July 24, 2017, where Dianna and a vocational expert testified. After the hearing, Dianna amended her alleged onset date of disability from June 3, 2010 to November 9, 2013. On August 15, 2017, ALJ LaRoche issued an unfavorable decision finding that Dianna was not disabled as defined in the Act. On June 1, 2018, the Appeals Council denied Dianna's request for review of this decision, making the ALJ's decision final. Dianna now requests judicial review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## II.   STANDARD OF REVIEW

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other

---

[2] Lumbar degenerative disk disease is a chronic degenerative condition of the lumbar spine that affects the vertebral bodies and intervertebral discs of the low back. The discs lose water content and shrink, and spurs often form as osteoarthritis develops. https://www.uofmhealth.org/conditions-treatments/cmc/back-neck-and-spine-conditions/lumbar-degenerative-disease (last visited August 14, 2019)

kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [him] unable to perform [his] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520. The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant—in light of his age, education, job experience and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law.

*Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Dianna is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial-evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues, *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004).

The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d at 872.

### III. BACKGROUND

#### A. Factual Background

Dianna was 54 years old at the time of her date of last insured in December 2015. [Dkt. 11-2 at 19 (R. 18).] She has a high school education, [Dkt. 11-2 at 38 (R. 37),] and last engaged in substantial gainful activity in 2010 when she worked as a cafeteria worker for Compass Group. [Dkt. 11-2 at 39 (R. 38).]

#### B. Medical History

In October 2008, Dianna was hospitalized for ST-elevation with myocardial infarction[3]. She ultimately underwent bypass surgery and valve replacement on October 14, 2008. [Dkt. 11-11 at 67-68 (R. 478-79).] After her surgery, Dianna was prescribed Coumadin[4], a blood-thinner, that she continues to take today, and she started being seen in an anticoagulation clinic at Premier Healthcare. [Dkt. 11-9 at 7-48 (R. 334-75).]

---

[3] ST-elevation with myocardial infarction is a very serious type of heart attack during which one of the heart's major arteries (one of the arteries that supplies oxygen and nutrient-rich blood to the heart muscle) is blocked. ECG Medical Training, https://www.ecgmedicaltraining.com/what-is-a-stemi/ (last visited August 22, 2019).
[4] Coumadin is a prescription medicine used to treat blood clots and to lower the chance of blood clots forming in your body. Blood clots can cause a stroke, heart attack, or other serious conditions if they form in the legs or lungs. http://www.coumadin.bmscustomerconnect.com/ (last visited August 27, 2019).

On November 20, 2014, State Agency physician Dr. Jason Fish conducted a consultative physical examination of Dianna for the purpose of establishing disability. [Dkt. 11-9 at 3-6 (R. 330-33).] Dr. Fish observed that Dianna appeared underweight; had tenderness to palpation/squeeze in the lower back; had a stooped posture; an antalgic gait; moderate pain in the lower back when walking on her heels and toes; and her squat was limited by back pain. After the physical examination, Dr. Fish concluded Dianna was able to stand and walk at least two out of eight hours of the day and carry at least 20 pounds. [Dkt. 11-9 at 3-5 (R. 330-32).]

On November 24, 2014, State Agency physician Dr. Joshua Eskonen reviewed Dianna's medical history. Dr. Eskonen concluded that Dianna was not disabled and denied Dianna's application at the initial level. [Dkt. 11-3 at 2-12 (R. 57-67).] Subsequently, on March 16, 2015, State Agency physician Dr. M. Brill reviewed Dianna's medical history and determined she was not disabled at the reconsideration level. [Dkt. 11-3 at 14-26 (R. 69-81).]

On June 16, 2015, Dianna began seeing Internal Medicine Specialist Dr. Eric Bannec in order to establish primary care. After the first visit, Dr. Bannec promptly ordered a lumbar spine MRI, which was done on June 30, 2015. The MRI exam revealed degenerative disc disease[5]; mild disc space narrowing, an annular fissure

---

[5] Degenerative disc disease: the condition of painful disc degeneration. It is marked by a significant decrease in hydration, making the disc inflexible, smaller, and more prone to tearing in the exterior. Dr. Hashim Khan, *Lumbar Degenerative Disc Disease*, Spine Health, https://www.spine-health.com/conditions/degenerative-disc-disease/lumbar-degenerative-disc-disease-ddd (last visited August 22, 2019).

at L4-5[6]; disc bulge at L2-3; moderate right and mild left facet arthropathy, and mild central canal stenosis at L3-4; moderate right neuroforaminal narrowing with possible impingement at right L3 nerve root. [Dkt. 11-15 at 38-39 (R. 634-35).]

After reviewing her MRI, on July 29, 2015, Dr. Bannec referred Dianna to Dr. Marshall Poor for a neurosurgical consultation and prescribed physical therapy and Meloxicam to manage the pain. [Dkt. 11-16 at 19-22 (R. 657-60).] On August 26, 2015, Dianna returned to Dr. Bannec for a regular check-up. He noted that she continued to have significant lower back pain and prescribed Gabapentin for the pain. [Dkt. 11-16 at 16-18 (R. 654-56).]

On September 24, 2015, Dianna attended her first appointment with Dr. Poor. [Dkt. 11-15 at 2 (R. 598).] Dr. Poor evaluated her back, right groin, and bilateral L5 radicular pain. Dr. Poor reviewed the June 30, 2015 lumbar spine MRI. [*Id.*] During the physical examination, Dr. Poor noted that Dianna had very limited flexion and extension in her back, a normal gait, and normal reflexes in the lower extremities. [Dkt. 11-15 at 2-4 (R. 598-600).] Dr. Poor diagnosed Dianna with displacement and degeneration of lumbar intervertebral disc without myelopathy[7],

---

[6] Annular Fissure: a tear inside the annulus fibrosus that causes fluid to leak from the disc. As the disc deteriorates, the disc could impinge on the person's spinal nerve. Dr. Neil Badlani, *What is Annular Tear?*, North American Spine, https://northamericanspine.com/conditions/annular-tear/ (last visited August 22, 2019).

[7] Displacement of a lumbar disc refers to protrusion or herniation of the nucleus pulposus, of the cushion-like disc resting between any two of the five lumbar vertebrae (vertebrae L1 through L5) in the lower spine. The intervertebral disc is comprised of an outer ring (annulus fibrosus) made of layers of collagen that surrounds and contains an inner gel-like material (nucleus pulposus). The intervertebral disc, along with the facet joints at the back of a motion segment created by two vertebral bodies, allows for movement of the segment. Displacement describes the nucleus pulposus pushing through the annulus and deforming the disc. A well-localized deformation of the disc is also referred to as a protrusion or herniation. Dr. Timothy Shane Shaw, https://ehr.wrshealth.com/live/patient_v2/instructions.php?id=2427086&iid=5117 (last visited August 27, 2019).

lumbosacral intervertebral disc, and spinal stenosis[8] in the lumbar region. [*Id.*] For treatment, Dr. Poor did not think Dianna would handle injections well due to her mechanical heart valve and because she regularly took Coumadin, and instead recommended that she try a trial of Transcutaneous Electrical Nerve Stimulation ("TENS") unit[9] for a month. Dr. Poor also prescribed Talacen for Dianna's pain. [Dkt. 11-15 at 2-4 (R. 598-600).]

On October 13, 2015, Dianna returned to Dr. Bannec for a routine check-up. Dianna was taking Meloxicam, Neurontin, Pentazosine, and undergoing physical therapy to manage her pain. [Dkt. 11-16 at 13-15 (R. 651-53).]

In his November 12, 2015 examination, Dr. Poor noted that Dianna's L4-5 disk herniation may possibly be causing her L5 radicular pain. He recommended surgery, but noted that Dianna was still not interested given her cardiac problems. During this visit, Dianna's gait was antalgic. This was a significant change from the September 2015 visit and suggestive of Dianna's attempt to avoid pain while walking. All other findings during the physical examination were similar to her

---

[8] Spinal Stenosis: a condition that occurs when the small spinal canal, which contains the nerve roots and spinal cord, become compressed. This causes a "pinching" of the spinal cord, and/or nerve roots, which leads to pain, cramping, weakness or numbness. Dr. Ali Duarte, *Spinal Stenosis*, American College of Rheumatology, Last Updated March 2019: https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Spinal-Stenosis (last visited August 22, 2019).
[9] A TENS unit is a device that sends small electrical currents to targeted body parts. These currents are used to relieve pain. *Transcutaneous Electrical Nerve Stimulation Unit*, https://www.healthline.com/health/transcutaneous-electrical-nerve-stimulation-unit (last visited August 22, 2019).

prior visits. Dr. Poor prescribed Talwin NX[10] for her pain. [Dkt. 11-15 at 5-7 (R. 601-03).]

On April 4, 2016, Dianna saw Dr. Bannec for a routine follow-up. Her medications and treatment plan remained the same. [Dkt. 11-16 at 9-12 (R. 647-50).] On April 28, 2016, Dianna returned to Dr. Poor, who noted that Dianna's physical examination reported normal findings. Dr. Poor maintained Dianna's prescription of Talwin NX, as it had provided Dianna with some temporary relief from her pain. [Dkt. 11-15 at 8-10 (R. 604-06).]

On August 2, 2016, Dr. Poor met with Dianna again and noted the same findings as in previous examinations. He did note that she had some right hip bursitis and cautioned against a long-term use of narcotic medication, but renewed her prescription for Talwin NX because it had provided pain relief. [Dkt. 11-15 at 11-13 (R. 607-09).]

On October 11, 2016, Dianna attended her six-month follow up with her primary care doctor, Dr. Bannec. Dr. Bannec ordered her a new prescription of pain medication and noted that Dianna had been seen by Dr. Ferguson for an ankle-brachial index/stress ABI[11] test which showed minimal disease. Her atypical lower

---

[10] Talwin NX is a combination of a narcotic pain reliever (opiate-type) and an opioid antagonist used to treat moderate to severe pain. https://www.rxlist.com/talwin-nx-side-effects-drug-center.htm (last visited August 27, 2019).

[11] An ankle-brachial index test is a quick, noninvasive way to check for peripheral artery disease ("PAD"). PAD occurs when narrowed arteries reduce the blood flow to your limbs, can cause leg pain when walking, and increases the risk of heart attack and stroke. *Ankle-brachial index*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/ankle-brachial-index/about/pac-20392934 (last visited August 22, 2019).

extremity claudication had improved, and the remainder of the examination was normal. [Dkt. 11-16 at 5-8 (R. 643-46).]

During her February 14, 2017 visit with Dr. Poor, he noted that Dianna had developed some problems with weakness, pain, and heaviness in her legs when walking. He believed this to be vascular claudication[12]. [Dkt. 11-15 at 14-15 (R. 610-11).]

On April 26, 2017, Dr. Bannec evaluated Dianna for her six-month follow-up and completed a disability medical source statement at that time. [Dkt. 11-16 at 2-4 (R. 640-42).] All of his findings were normal and in line with the previous visits. [*Id.*] In his medical source statement, under diagnosis, Dr. Bannec listed lumbosacral disc disease and a mechanical heart valve in the context of coronary artery disease. [Dkt. 11-15 at 30-34 (R. 626-30).] When explaining Dianna's symptoms, Dr. Bannec identified chronic back pain that was worse with sitting or standing for too long. [*Id.* at 30 (R. 626).] He indicated that Dianna's impairments had lasted or could be expected to last at least twelve months. *Id.* He also noted that depression, anxiety, and psychological factors contributed to the severity of Dianna's symptoms and functional limitations. [*Id.* at 30-31 (R. 626-27).]

Additionally, in the medical source statement, Dr. Bannec explained that in a competitive work situation, Dianna could walk two blocks without rest or severe

---

[12] Vascular Claudication is pain caused by too little blood flow. Sometimes called intermittent claudication, this condition generally affects the blood vessels in the legs. As claudication worsens, the pain may affect you even when you're at rest. Most often, claudication is a symptom of peripheral artery diseas. *Claudication*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/claudication/symptoms-causes/syc-20370952 (last visited August 26, 2019)

pain. [Dkt. 11-15 at 31 (R. 627).] He also noted that Dianna can only sit for 30 minutes and stand for approximately 20-30 minutes at a time. In an eight-hour work day, Dr. Bannec opined that Dianna could sit for two hours and stand and walk for about two hours. Dianna would need a job that permitted shifting positions at will, and would need unscheduled breaks for five to ten minutes every hour due to pain and fatigue. He opined that Dianna was only capable of low stress work and would be off task for about 75% of the work day. Dr. Bannec concluded that Dianna would miss more than four days per month of work due to her chronic back pain and depression. [Dkt. 11-15 at 30-34 (R. 626-30).]

### C. ALJ Decision

In determining whether Dianna qualified for benefits under the Act, the ALJ went through the five-step analysis required by 20 C.F.R. § 404.1520(a). At step one, the ALJ found that Dianna was insured through December 31, 2015 and had not been engaged in substantial gainful activity between her alleged onset date of November 9, 2013 and her date last insured. [Dkt. 11-2 at 13 (R. 12).] At step two, the ALJ found that Dianna's severe impairments to include: "degenerative disk disease of the lumbar spine, with stenosis; and history of congestive heart failure, status post coronary artery bypass with grafting and valve replacement." [Dkt. 11-2 at 14 (R. 12).]

At step three, the ALJ considered the listings for spinal abnormalities (1.04, 1.04A, and 1.04C) and major dysfunctions of a joint (1.02) and determined that Dianna did not meet or equal any of the listings. [Dkt. 11-2 at 15 (R. 14).] Next, the

ALJ determined Dianna had a residual functional capacity ("RFC") to perform light

work with the following exceptions in an eight-hour work day:

- stand and/or walk for a total of 2 hours and sit for a total of 6 hours;

- cannot climb ladders, ropes or scaffolds;

- occasionally climb ramps/stairs, balance, stoop, kneel, crouch or crawl;

- can tolerate no more than occasional exposure to workplace hazards.

[R. 14.] The ALJ then determined, at step four, that Dianna could not

perform her past work as a cafeteria worker. At step five, based on the vocational

expert's testimony, the ALJ found that Dianna could perform the work of an

information clerk, sorter, or packer. Accordingly, the ALJ determined that Dianna

was not disabled under the Act.

### IV.    Analysis

Dianna asserts that the ALJ erred by giving greater weight to the two State

Agency non-examining physician than to the two examining physicians.

Specifically, Dianna argues that the ALJ erred in his evaluation of what weight to

assign each medical opinion.

### A. Assigning Weight to Medical Opinions

#### i.  Dr. Brill and Dr. Eskonen – State Agency Physicians

The Plaintiff first argues that the ALJ erred by assigning great weight to the

medical opinions of the State Agency physicians, Dr. Brill and Dr. Eskonen, who

only reviewed Dianna's medical records as of 2014 and did not have the benefit of

reviewing Dianna's later treatment records and MRI results. Plaintiff directs the

Court to the medical records submitted after the non-examining physicians' review of the medical records. Specifically, Plaintiff alleges that the following medical information, individually or collectively, could support a medical opinion finding significantly greater RFC limitations than those found by the ALJ:

- The lumbar MRI, dated June 30, 2015, which evidences annular fissure at L4-5, moderate neuroforaminal narrowing at L3-4 and L4-5, and possible nerve root impingement at the L3 and L4 nerve roots. Dkt. 11-15 at pp. 20-21, R. 616-17.
- The entirety of Internal Medicine Specialist Dr. Bannec's treatment of Dianna, consisting of records from June 6, 2015 through April 26, 2017. Dkt. 11-16 at pp. 2-56, R. 640-94.
- The entirety of Neurosurgeon Dr. Marshall Poor's treatment of Dianna, consisting of records from September 24, 2015 through February 14, 2017. Dkt. 11-15 at pp. 2-21, R. 601-17.
- Dr. Bannec's detailed medical source statement, which provides his medical opinion with respect to numerous limitations consistent with a less-than-sedentary RFC, and which, even if considered only in part, precludes employment according to the vocational expert at the hearing.

[Dkt. 11-15 at pp. 30-33, R. 629-29; Testimony at Dkt. 11-2 at pp. 53-54, R. 52-53.]

The Defendant responds by arguing that it was not error for the ALJ to rely on the reviewing doctors' opinions despite the fact that they did not review the new records and MRI because Plaintiff did not provide any evidence that the reports would have changed the doctors' opinions.

In *Scheck v. Barnhart*, the Seventh Circuit stated that although "it is true that the ALJ has a duty to make a complete record, this requirement can reasonably require only so much." 357 F.3d 697, 702 (7th Cir. 2004). Leaning on that decision, in *Keys v. Berryhill*, the Seventh Circuit stated "[i]f an ALJ were required to update the record any time a claimant continued to receive treatment, a

case might never end." 679 F. App'x 477, 481 (7th Cir. 2017). However, in *Moreno v. Berryhill*, the Seventh Circuit explained that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." 882 F.3d 722, 728 (7th Cir. 2018). *See Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment"); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014).

In *Goins*, the Seventh Circuit held it to be error for the ALJ to have denied the plaintiff disability benefits based on the unsound reasons provided by the ALJ. After the State Agency physicians had conducted their medical records review, the Plaintiff underwent an MRI exam that revealed that she had degenerative disc disease, spinal stenosis, and a Chiari I malformation in her brain. *Id*. No medical expert analyzed the MRI or opined as to its effect on the Plaintiff's functional limitations. The ALJ denied the Plaintiff's request for benefits in part because she accepted the consulting physicians' conclusions, even though those physicians did not examine the Plaintiff. As the Seventh Circuit concluded, "[f]atally, the administrative law judge failed to submit that MRI to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence." *Id*.

In the present case, the ALJ relied on the opinions of two consulting, non-examining State Agency physicians, Dr. Eskonen and Dr. Brill. [Dkt. 11-2 at 17 (R. 16).] These two physicians did not have access to updated diagnostic reports or

medical diagnoses that was later submitted and the record does not show that any medical expert analyzed the MRI which showed degenerative disk disease, annular tears, moderate neuroforaminal narrowing, and possible nerve root impingement. None of this evidence was submitted to medical scrutiny. Additionally, neither Dr. Eskonen nor Dr. Brill examined Dianna; they only analyzed an incomplete medical record to form their opinions. As the ALJ did in *Goins*, the ALJ here summarized the results of the 2015 MRI without seeking assistance from a medical expert to make a conclusion about Dianna's disability status.

Plaintiff argues that any of those pieces of evidence, individually or as a whole, could alter the opinions of the State Agency physicians. Moreover, the ALJ himself reviewed those pieces of subsequent medical evidence and recited parts of them in his opinion, concluding that "the objective, imaging, clinical and laboratory evidence does not demonstrate any injury or pathology that could have been expected to prevent claimant from performing the limited range of light work set forth above." [Dkt. 11-2 at 19 (R. 18).] The evidence from the June 30, 2015 lumbar spine MRI showed an annular fissure at L4-5; moderate neuroforaminal narrowing at L3-4 and L4-5; and possible nerve root impingement at the L3 and L4 nerve roots. [Dkt. 11-15 at 20-21 (R. 616-617).] The treatment notes of Dr. Bannec and Dr. Poor both show that Plaintiff suffers from degenerative disc disease with lower back pain. In Dr. Poor's notes specifically, he indicated that Dianna had suffered from L-5 radiculopathy and an L5-S1 disk herniation that for many years was treated

previously by Dr. Tiwari, an observation that is echoed continuously through his treatment of Dianna.

Relying on the MRI, Dr. Bannec explained in his medical source statement that in a competitive work situation, Dianna would need a job that permitted shifting positions at will and would need unscheduled breaks for five to ten minutes every hour due to pain and fatigue. He opined that Dianna was only capable of low stress work and would be off task for about 75% of the work day. Dr. Bannec concluded that Dianna would miss more than four days per month of work due to her chronic back pain and depression. [Dkt. 11-15 at 30-34 (R. 626-30).] This drastically changed the outdated assessment by Dr. Eskonen and Dr. Brill.

The ALJ states findings in his opinion, but does not provide any analysis from a medical expert as to how these medical records affect Plaintiff's ability to work and whether they individually, or as a whole, support a finding of disability. The lumbar spine MRI and treatment notes from both Dr. Bannec and Dr. Poor postdate Dr. Brill's examination of Plaintiff's medical records at the reconsideration level. There are two years' worth of treatment notes that have not been evaluated and could have changed the State Agency physicians' opinions. Thus, the ALJ should have submitted the MRI and treatment notes to medical scrutiny before making a conclusion about Dianna's RFC limitations. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014).

The ALJ gave great weight to Dr. Eskonen and Dr. Brill, but gave little weight to Dr. Fish, a consulting examining physician, because "[t]he MD . . .

apparently accepted wholesale claimant's subjective complaints about difficulties with particular activities" and Dr. Fish's "observations of claimant's abnormal gait and posture were not echoed in contemporaneous treatment notes." [Dkt. 11-2 at 17 (R. 16).] At the end of his opinion, the ALJ states that "the [consulting non-examining State Agency physicians] were consistent with the MD consultative examiner's findings and they were consistent with treatment documentation during the period at issue, claimant's reported activities, and the record as a whole." [Dkt. 11-2 at 17-18 (R. 16-17).] Based on a review of the evidence, these statements are not accurate.

Plaintiff had no primary care doctor prior to 2015, so her medical records are scant and the only contemporaneous treatment notes to which the ALJ could be referring come from mid-2015 or later. Similar to Dr. Fish's November 2014 observations, Dr. Poor's examination of Plaintiff on November 12, 2015 shows that her gait was antalgic. Dr. Poor's notes consistently show that he recommended surgery to address Dianna's back pain, but that she did not want to pursue it due to her heart condition. [Dkt. 11-15 at 2 (R. 598-611).] Dr. Poor was familiar with the lumbar spine MRI which showed the annular tears, neuroforaminal narrowing, and nerve impingement, and formed the basis of his diagnosis of degenerative disc disease. All these findings were in line with Dr. Fish's assessment of Dianna's lower back pain while walking on her heels and toes as well as her during her limited squat. Additionally, they pursued alternative treatment options, such as physical

therapy and narcotic medications, that helped alleviate the pain temporarily, but never fixed the underlying issue.

Dr. Bannec's medical source statement is also in conflict with the ALJ's assessment of the medical record and Dianna's restrictions. Dr. Bannec reviewed the lumbar spine MRI and made the same findings as Dr. Poor, diagnosing Dianna with degenerative disc disease. Dr. Bannec's medical source statement provides, for example, that in an eight-hour work day Plaintiff could stand for 20-30 minutes at one time and could sit for 30 minutes at one time before needing to stand up, for a total sitting time of 2 hours and a total standing time of 2 hours. [Dkt. 11-15 at 31 (R. 627).] This assessment is more in line with Dr. Fish's November 2014 assessment.

Dr. Fish was a State Agency physician who actually examined Dianna along with her medical record. Dr. Fish concluded, similar to Dr. Bannec, that Dianna would be able to stand and walk for at least two hours in an eight-hour workday. [Dkt. 11-9 at 5 (R. 332).] With the information from both Dr. Fish and the MRI, Dr. Bannec's medical opinion as to how often Dianna could sit, stand, or walk throughout the work-day was supported by the evidence. The ALJ instead decided to base his opinion on Dr. Eskonen and Dr. Brill's conclusions, even though they had not reviewed the subsequent MRI and treatment notes.

Although the ALJ bases his conclusions on the State Agency physicians' opinions, the ALJ fails to engage with the evidence that does not support his conclusions. "An ALJ has the obligation to consider all relevant medical evidence

and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Mischler v. Berryhill*, 766 Fed. App'x 369, 374 (7th Cir. 2019); *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). The ALJ's opinion states a number of findings pulled from the medical reports, but the ALJ's opinion does not discuss the evidence that contradicts his conclusion.

Given that the medical evidence from 2015 to the present is substantial and could change the opinions of the State Agency physicians, the ALJ made an improper conclusion rooted in outdated assessments and without the assistance of a medical expert. The newly submitted evidence could alter the opinions of the State Agency physicians and needed to be submitted for medical scrutiny so that the ALJ could properly assess Dianna's medical condition, specifically her disability status, to make a supported conclusion as to whether she was disabled at the time of her onset date or date of last insured.

The ALJ provided specific reasons for giving great weight to the opinions of Dr. Eskonen and Dr. Brill, but those reasons were based on an incomplete representation of the records that existed as of late 2014. Moreover, when presented with subsequent medical evidence, including a lumbar spine MRI and neurosurgery treatment notes, the ALJ did not submit that information to medical scrutiny and instead based his conclusions about Dianna's limitations on his own review of the evidence. Without a proper analysis of the evidence in the record, the ALJ erred in giving great weight to the State Agency physicians.

## ii. Dr. Bannec- Treating Physician

The Plaintiff argues that the ALJ improperly assigned limited weight to the opinion of treating physician, Dr. Bannec, the only physician to provide a medical opinion based on Dianna's MRI results. The Defendant responds by arguing that the ALJ properly considered and weighed Dr. Bannec's opinion in conjunction with the other medical opinions in the record.

Based on the filing date of Dianna's application, the treating physician rule applies. *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating physician rule applies only to claims filed before March 27, 2017). In *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)6), the Seventh Circuit held that a "treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

"If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740 (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)); *see* 20 C.F.R. § 416.927(c). However, so long as the ALJ "minimally articulates" his reasoning for discounting a treating source opinion, the Court must uphold the determination. *See Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008)

(affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527).

Here, the ALJ offers:

> Limited weight was given to Dr. Bannec's opinions, which were overly sympathetic to the patient. Dr. Bannec only began treating clamant about six months prior to the December 2015 last insured and his form statement significantly postdates that. Dr. Bannec's contemporaneous treatment documentation records mostly normal examination findings, not findings supportive of such great restrictions on claimant's lifting, sitting and standing throughout the work day.

[Dkt. 11-2 at 19 (R. 18).]

The ALJ does discuss two of the relevant regulatory factors, the length of the treating relationship and the consistency and supportability of the physician's opinion, but the ALJ's discussion of each does not equate to "good reasons." "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Scott*, 647 F.3d at 739 (citing *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306). First, the ALJ's suggestion that Dr. Bannec's opinion is overly sympathetic, which is to say that this treating physician might exaggerate his patient's symptoms and capabilities, is based on nothing but speculation and cannot constitute a good reason for discounting Dr. Bannec's opinion. *See Rockwell v. Saul*, No. 18-2138, 2019 WL 3739810, at *4 (7th Cir. 2019) (the Court determined that the ALJ's conclusion that treating physicians lie about patients' symptoms was not supported by anything in the record and was based on speculation). Nothing in the record supports this assertion; in fact, the opinions of Dr. Fish, the consulting examining physician, and Dr. Poor, Dianna's neurosurgeon, support Dr. Bannec's

work restrictions and medical conclusions. All three doctors determined that Dianna's back pain, inability to stand for significant periods, and overall health affected her ability to work.

The ALJ also concludes that Dr. Bannec's contemporaneous treatment notes do not support the restrictions assessed in his April 26, 2017 treating source statement. [Dkt. 11-2 at 18-19 (R. 17-18).] "If an ALJ discounts a treating physician's opinion because it is inconsistent with the evidence, the ALJ must explain the inconsistency." *See Stacy A. v. Berryhill*, No. 17 C 6581, 2019 WL 1746207 (N.D. Ill. Apr. 18, 2019) (citing *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 819 (N.D. Ill 2006). The fact that Dr. Bannec failed to mention in his treatment notes the limitations that he included in the later source statement does not imply that Dr. Bannec exaggerated in the latter. *See Rockwell*, 2019 WL 3739810, at *5 (it was reversible error for the ALJ to discredit a treating physician's statement on the claimant's limitations where the physician's opinion was supported by the record and no medical source opined that the listed restrictions were inconsistent with the claimant's condition).

Moreover, no other medical source opined that Dr. Bannec's listed restrictions were inconsistent with Dianna's complaints of pain. Instead, Dr. Poor concluded that the Plaintiff suffered from a chronic back condition that may never be cured and various doctors over the years attempted to treat Dianna's pain through physical therapy, steroid injections, and several different narcotic medications. Dr. Bannec's medical opinion had the further benefit of being based on the 2015 lumbar

spine MRI. Furthermore, Dr. Fish, who did not have the benefit of reviewing

Dianna's MRI or treatment records after November 2014, largely agreed with Dr.

Bannec's conclusions and found the same functional limitations, such as only being

able to stand and walk for two hours in an eight-hour work day, in his examination

of her as well. [Dkt. 11-9 at 3-6 (R. 330-33).]

The Plaintiff finally argues that it was not harmless error for the ALJ to give

limited weight to Dr. Bannec's opinion because the vocational expert testified at the

hearing that a hypothetical person of Dianna's age, education, and past vocational

history who needed to elevate their legs for five minutes of every hour to waist level

would be precluded from employment. [Dkt. 11-2 at 53-54 (R. 52-53).] In Dr.

Bannec's medical source statement, he indicated that Dianna would need to have

her legs elevated straight out for at least 25% of the time during an eight-hour work

day. With a proper evaluation and weighing of Dr. Bannec's medical opinion, the

ALJ may conclude that Dr. Bannec's leg elevation assessment is proper and

supported. Accordingly, the Court cannot say that the ALJ's error was harmless.

### iii. Dr. Fish- Consulting Examining Physician

Lastly, the Plaintiff argues that the ALJ improperly dismissed Dr. Fish's

opinion. Dr. Fish examined Dianna on request by the SSA on November 21, 2014.

The Defendant argues that the ALJ gave good reasons for discounting Dr. Fish's

conclusions. 20 C.F.R 404.1527(c)(1) states that generally ALJs "give more weight to

the medical opinion of a source who has examined [a claimant] than to the medical

opinion of a medical source who has not examined [a claimant]." 20 C.F.R.

404.1527(c)(1). In *Gudgel v. Barnhart*, the Seventh Circuit held that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." 345 F.3d 467, 470 (7th Cir. 2003).

Here, the ALJ explains his reasoning for giving limited weight to Dr. Fish's opinion:

> The undersigned gave limited weight to the opinions of this MD. The MD's observations of the claimant's abnormal gait and posture were not echoed in contemporaneous treatment notes. The MD apparently accepted wholesale claimant's subjective complaints about difficulties with particular activities.

[Dkt. 11-2 at 17 (R. 16).]

The ALJ discounts the opinion of Dr. Fish because the observations reflecting Dianna's abnormal gait and posture were not echoed in contemporaneous treatment notes. During this consultative visit, however, Dianna did not have a primary care physician and, therefore, contemporaneous treatment notes would not exist. The only contemporaneous treatment notes that the ALJ could be referencing come from Dr. Bannec and Dr. Poor. During her September 2015 visit with Dr. Poor, Dianna's gait was normal, but two months later, during her November 2015 visit, Dr. Poor noted that Dianna exhibited an antalgic gait. [Dkt. 11-15 at 2-7 (R. 598-03).] The ALJ's reason for discounting Dr. Fish's medical opinion is incomplete at best.

It appears the ALJ failed to address pieces of information that contradicted his conclusion. Dr. Fish documented reduced pulses and reflexes in the Plaintiff's lower extremities, reduced forward flexion, and lower back pain with palpation. All of these objective findings are supported by various contemporaneous treatment

notes from Dr. Bannec and Dr. Poor. As noted previously, the opinions of the non-examining physicians, Dr. Eskonen and Dr. Brill, contradict Dr. Fish's opinion, but they did not have the benefit of reviewing the subsequent medical evidence and lumbar spine MRI. Because the records from both Dr. Bannec and Dr. Poor support Dr. Fish's findings, the contradicting opinions of Dr. Eskonen and Dr. Brill are not, on their own, enough to justify the ALJ's rejection of Dr. Fish's opinion.

While ALJs do not need to discuss every piece of evidence in the record, ALJs are not permitted to ignore a line of evidence that undermines the conclusions made, and the ALJ must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012). The ALJ here did not create a logical bridge between the evidence and his conclusions and, therefore, his decision to give limited weight to Dr. Fish's medical opinion was not supported by the evidence in the record.

## V.   CONCLUSION

The ALJ here did not properly weigh the medical opinions of the treating, examining, and non-examining physicians in the record. The ALJ did not provide adequate reasoning for discounting the opinions of the treating and examining physicians, while crediting the opinions of the non-examining State Agency physicians. For these reasons, the Court **REVERSES** and **REMANDS** the ALJ's decision denying Plaintiff benefits. Final judgment will issue accordingly.

So ORDERED.

Date: 8/29/2019

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record.